The case was taken under advisement. Our second case this morning is Sauk Prairie Conservation Alliance v. Department of the U.S. Department of the Interior, and I'm here today on behalf of the Sauk Prairie Conservation Alliance. Usually when I get up to do an argument, I want to point the court to three different things to focus on. Today, I really think there's one thing that I'd like you to leave here with today, and if you agree with me on this one point, all the other issues in the case don't matter. That point is this. The Federal Surplus Property Act states unequivocally that the purposes at the time of conveyance are to be in perpetuity. The National Park Service here has agreed in writing to the DNR that the purposes at the time of conveyance, which were in the program of utilization, did not include the contested uses. That's why we're here today to do ... We're challenging an amendment to the program of utilization. The government would like to read that provision out of the statute and say, well, what Congress really meant was recreation and park uses, but Congress uses that language elsewhere in this statute multiple times and has made it very clear that the property is only to be used for recreation and public park uses. Are you focused on just these three things then? The helicopters, the dog training, and the ... What's the third? Yes, the three things are military helicopter training, motorcycle events, and dog training with guns. But you have no problem with snowmobiles? No. The reason is, the statutory question is not about the impacts. The statutory question is, what were the purposes at conveyance? At conveyance, both hunting and snowmobiling were all talked about and were all part of the grand agreement that came about ... This is 20 years ago now. We're part of the 2004 application. What we are here today to talk about are the things that have been added that our view and the Park Service has agreed were not part of the original program of utilization. That language in the original program of utilization was stated at a very high level of generality and in non-exclusive language. It said, we'll include, and then a whole variety of things under a very broad recreational umbrella. Sure. I would agree that it was a broad ... There were some broad language there. I think, frankly, common sense dictates that these types of uses wouldn't fall within the list of uses that they were talking about at the time, and honestly, it doesn't make much difference because the government has admitted and has amended the program of utilization. They've already taken the position that these uses were not part of that program of utilization. Right. The National Park Service is treating the master plan, the second one, as an amendment to an approved use of previously approved action for purposes of federal environmental law. Correct. I guess, can I clarify that point? Yes. There's a voluminous record, and I can point you to this specific language that I'm talking about when I'm talking about the Park Service. They sent a letter, and it's in Appendix 10 AR4154. The Park Service, when commenting on the master plan, the draft of the master plan, said, quote, the master plan proposes active recreational uses and amenities not contemplated in the original federal lands to parks program application. So, basically, the Park Service said, you have to amend your program of utilization, and yes, you're right, your honor, they then took the final master plan as an amendment to that program of utilization. Right, but the language, there's language later in the program of utilization, which is the fancy term for the application to get this property and to submit it, right? Correct. And it talks about the master plan will actually define the terms of the deal, right, between the feds and the state. Yeah, I mean, there is some language. I don't think any of this language at the time was written very clearly, frankly, but I do think that, again, the Park Service has admitted, and I don't think a reasonable reading of the program of utilization that was done in 2004, especially given the context of all the discussions that had happened before that, would include these uses, and I think the Park Service has already admitted that. Well, isn't the real important question as to your Property Act claim what the deeds say, because this is a Property Act case, and your claim is that the federal government has failed to appropriately enforce the terms of the deeds? Actually, no. So what the government is arguing here is that they can somehow negate the statutory language that says the purposes at conveyance are supposed to be in perpetuity by changing the deeds. So, for example, for helicopter use, they have just deeded 137 acres. One of the many deeds was for 137 acres, and they say, well, we're going to allow helicopter use, even though everyone admits, the government, the DNR, certainly my client, that helicopter training is not a recreational use. So they have essentially tried to rewrite the statute by changing the deed. It's also somewhat disingenuous that they say helicopter use is only going to happen on this 137 acres. There's a map in the record, which I can give you the site for, that I think is pretty critical for the court to look at, which is on Appellant's Appendix 550 AR4166, and I can hold it up. I didn't bring a big poster board, because I was told that's not a good practice. But the blue area, this is the whole property. The very small green area is where the helicopters take off and land. That is where the deed covers the helicopter issue. But the blue area is where they can go down to 25 feet above the ground in their training. So it's somewhat, and if you don't know, and you may, helicopters usually are not allowed to go below 500 feet above ground, and that's what the red area is. This is the Ho-Chunk property. A long time ago, when I was in Vietnam, I got plenty sick of helicopters, but I can understand why helicopters are not compatible, but the trouble is they've been there a long time. That's true, but they've been there a long time when this was owned by the Army, and so of course the Army could use the Army's property for helicopter training. But now we're under a different statutory regime, and the federal government gave this to the DNR under specific statutory provisions that say you have to use this for recreational property and recreational and park uses. And so if the government didn't, if this was important enough to the government, they could have not given the property to the DNR. Of course, that's not really what we want, but the point is the same. The statute also says that the deed can contain additional terms, reservations, restrictions, and conditions necessary to safeguard the interests of the government, and the helicopter training likely falls within that reservation because it's specifically reserved in the deed? It could. Well, first of all, they only did that for that small 137-acre parcel, so that doesn't deal with the fact that they can go down to 25 feet above ground. If you've been in a helicopter, I haven't. I'm afraid of that sort of thing. I would imagine 25 feet above ground is pretty low in a helicopter, but to answer your question about the reservation, there's a specific requirement that the secretary make a finding that that was never done here, and in fact, that deed was issued a day after they approved the program of utilization. So technically speaking, the record before us deals with the amendment to the program of utilization. The helicopter deed was the day after that, and there's nothing in the record that any is necessary for the government's use. In addition, in the record, it's very clear that I think it would be hard for them to argue it's in the interest of government, or I forget what the exact language is, but necessary to preserve the interest of government, given that they can go to Fort McCoy, which is 20 minutes further away. Yes? Not ideal? Isn't that where these helicopters are coming from? No, they come from Madison, actually, so they're at the Madison Airport. I've learned a lot about this since while this appeal has been pending, but they're at the Madison Airport, and so they're flying to Sauk, which is a little bit closer than flying to Fort McCoy, and that's why they want to do the training there. So yes, it is the Army, but really, is that a rise to the level of the interest of the government that they don't want to fly 20 minutes further? I don't know. Even if you're right on the statutory violation of the Property Act, don't we have a remedial problem here, that we don't have jurisdiction to order the government to claw back? I know that's the government's position. I don't agree with that. Well, that's what the APA says, right? What's that? This is a discretionary determination. Well, it's not. Actually, the language, and we're jumping around, which is often the case in these sorts of things, but if you give me one second, Section 550B1 of this is the Property Disposition Act, says, quote, well, it says, the Secretary of Interior, and I quote, shall, it doesn't say may, shall determine and enforce compliance with the terms, conditions, reservations, and restrictions contained in an instrument by which a transfer under this section is made. So, I've read- Right, but the remedy of the claw back is stated in discretionary terms, is it not? One of the remedies. So, the government would like this court to determine that the only remedy they have is to take the property back, but I think common sense says otherwise. If I deed a property to somebody and they don't comply with the deed, my only remedy is not the most extreme remedy, which is take it back. I can also go to court and enforce the terms of that deed. I could not approve the Program of Utilization Amendment and say, no, this isn't within the confines of what you're allowed to do. There are lots of other things. Yes, I agree completely that that one sort of nuclear option, for lack of a better word, which is the government comes in and takes the property back, is at the option of the government, but that's not what the earlier provision says. It says they shall enforce the terms of the deed. So, and this all gets to only one of our requests to the court. We've requested that the court order the government to enforce it, but we've also said that they should act by approving the Program of Utilization Amendment, and that is not, this court could certainly do that without enforcing, without ordering them to actually enforce the terms of the deed. Well, what about the dog training or trialing? Those are two different things. They are. But it's no problem with people with dogs on leashes. That's correct. And then the other one, where we talk about, I don't know what that dual motorcycle is. What's dual about it? I've also learned a lot about that in the time period. So we finally got our state contested case hearing on this, so we had a week-long hearing with lots of evidence. But I'm going to stick to what's in the record here. Well, you focused on three things. That's the only reason I'm... Yeah, the motorcycle events are six days a year. They're allowed to ride up to 100 motorcycles in a two-day, it's basically two-day eventing. So like on a weekend, a motorcycle, a 100-mile motorcycle race might be, would be able to go through essentially half of the trails on the property. Really? Yeah, twice. And that would be two days at most in a row, up to six total days a year. That'd be a day when the horses aren't out there. Well, I don't know. That's... Yes. They've said they will mark off those specific trails so that the horses and people won't be on them. I think it's, I mean, getting to the NEPA issues, I think it's disingenuous to say that's the same as riding on a regular street, a motorcycle. The impacts are the same, don't worry about it. Obviously riding on trails will destroy the trails, they'll have to rebuild the trails. The riding in the nesting bird period, they didn't even exclude it, which most of the time you would think they would do, they would exclude it during the nesting bird period because there's a period of time at which birds are more vulnerable and they didn't do that here. So, and to answer your question about the dog trialing and training, something else I knew nothing about, they have special events. So trialing is a special event where they come and it's like competition. Training is basically they can use 72 acres and go out and shoot blanks and train the dogs. The issue that the alliance has and the reason why this is different than just normal dog use is the use of firearms. But it's okay to be out hunting out there. Well they only hunt in hunting season, which is not a peak time of year for... But they use guns, this isn't bow and arrow. What's that? Hunting is with guns, is that correct? Yeah, yeah, hunting is with guns. And again, that was allowed and envisioned back 20 years ago when all this was going on. But it's in the hunting period and as you probably know, that's around Thanksgiving. That is not a bird breeding season. That is not the same thing as saying, I can go out and shoot guns any day of the week on 72 acres. And the government's position that the impacts of shooting guns would only be to 72 acres, again belies common sense. Guns are allowed. Well, if we're moving into the EPA claim here, maybe you can help me with something. I'm having some difficulty discerning the origin of the categorical exception that's claimed here. I can give you a site for that. So the categorical exception, well, let me ask you. I mean, I know what the regulations say. I don't want to ask you, but do you mind by origin, the statute, or the actual guidance site? I know what the statute says and I know what the regulations say about the categorical exception. I'm trying to find where the National Park Service has promulgated this as a categorical exception. It wasn't in the appendix. It is in the appendix, but it may, or at least the site I have that someone gave me says it's in the appendix, but it's Appellant Appendix 9 AR4153. And actually, I'm glad you brought this up because the quote, let me just read you the one sentence. It says, changes or amendments to an approved plan, which in this case is the program of environmental impact. Where does that appear in the Federal Register? I think it might be in a guidance document. I'm not sure. It's in an NPS handbook, I believe, or an interior handbook. You might have to ask the government. Well, understood, but I'm surprised that parties didn't focus more intently on the origin of this categorical exception because as I understand the statute and the regulations, a categorical exception has to be promulgated through notice and comment rulemaking and published in the Federal Register. It can't just appear in a handbook. And if that's what's being invoked here, there may be a question about the validity of this categorical exception, setting aside the question about whether this application of it is appropriate. Yeah, I mean, we haven't raised that concern, so I can't answer the question. I don't know the background of that categorical exclusion. I do know I've done a lot of NEPA work. I'm personally not... NEPA is pretty burdensome. I'm not a huge fan of NEPA, but it is what it is, Congress wrote it, and a lot of the agencies have these categorical exclusions that are in handbooks that are just like practice manuals and they do this. So whether or not that's okay, we haven't really raised. We don't think you need to get there because we don't think it meets the actual categorical exclusion. Well, the categorical exclusion itself is completely circular. Yeah, well, that too, right. In the regulation, it's incredibly circular and makes no sense. Right, and then the whole idea of a categorical exclusion is that there's supposed to be an environmental assessment or evaluation done at a categorical level, and then everything else... Once that's done and it's promulgated, then everything that falls under that... You would think so, but apparently that's not how it's being used. And in this case, it's even more circular because we have the federal government relying on a state EIS, which if you know anything about NEPA, is the highest level of NEPA review, meaning the state either determined or they say they voluntarily did it, but you only do an EIS if there are significant environmental impacts. And the federal government is saying, oh, based on that environmental impact statement that the state did, we're going to do the lowest level of review, a categorical exclusion, and find that there's no or minimum impacts. That reasoning alone shouldn't stand. The federal government should not be able to rely on a state document that is based on significant impacts to say there are no or minimal impacts. Yeah, and EIS is often just a delay. Yeah, they're not fun. I'm usually on the side of drafting the EIS, so I'm not a fan. But in any event, the statute says what it says. We're not here to revise NEPA. So again, I've jumped around. Do you have any other questions? I mean, I think I've hit most of my points. Your argument, as I understand it, about the application of this categorical exclusion is that it used the wrong baseline. It treated the master plan, the second master plan, as an amendment. Well, and that's why I wanted to point you to the language of the categorical exclusion itself, because the language of the categorical exclusion itself is focused on the fact that it's an amendment. And so for the government to say, well, we're going to net benefit, essentially, all the benefits of the master plan, which obviously are a lot, because they're taking this property, which is not in a degraded state right now. It's sort of in between. It's been cleared up. There's some restored prairie there. But certainly, it's not as good as it will be in 10 years. But the categorical exclusion is focused on the amendment. And then the government says, the entire master plan is going to make it better, so these impacts that we're adding are going to be minimal. So it's kind of, again, doublespeak. They're saying, here's the amendment. I only have to look at the amendment for the categorical exclusion, but I'm going to rely on all the benefits I get from the original plan. Is highly disturbed your term or theirs? That's their term. So no one would dispute that this property was highly disturbed 20 years ago, when there were still hundreds of buildings and ongoing environmental remediation. But today, it's open as a soft prairie recreation area. Almost all the buildings have been taken out. My client has been working to restore prairie there for over a decade. The DNR's analysis in 2009, they did an analysis of the property in 2009, found all kinds of sensitive bird areas and species. So yes, it's not the pristine park it will be. But really, what we're looking at, the action and the baseline is kind of a red herring. The baseline is, and we would agree, what the property is today. But the action is over the next 15 years. That's what's going to happen over the next 15 years. So you have to consider, the property's going to get better in the next 5 or 10 years, and what are helicopter training and motorcycle events going to do to that property? So on your argument, the baseline should be current conditions under the existing plan without the amendments. That should be the baseline. No. And then compare what... I'm saying the baseline is the property today. Go out to the property, that's the baseline. It has sensitive species on it. But the action that we're talking about is a plan that goes for 15 years. That plan and those uses were already approved. So you have to consider how helicopter training and motorcycle events are going to impact the property in that 15-year time frame, of which there's going to be restoration, there's going to be lots of other things. So, and again, it's hard for me standing here to say what those are going to be, and the government constantly is saying the alliance didn't put forth any evidence, but there wasn't even a public comment period on this amendment to the program of utilization. So we, I mean, this is a record review. So I don't even know how we would have done that. So you agree that the baseline should include the plan benefits as a whole? No. That's a separate issue. The baseline is what the property is today. The law says in the NEPA handbook, and there are multiple cases that we've cited in our brief, that you can't just, for NEPA, net out the benefits. Otherwise, if you built a solar farm out somewhere in Wisconsin, took up 1,500 acres, the government could say, well, overall, solar's better for the environment, so I don't need to do a NEPA analysis. The courts have said you can't do that. There's a decision, which I brought with me, called Katrin County, where there was an Endangered Species Act action, and they said, well, you can't, yes, listing of endangered species is better for the environment, but that can't get you out of NEPA. You still have to analyze the impacts. That's kind of the same thing here, which is, you can't say, oh, the master plan over the next 15 years is going to be better for the environment, so we can do whatever we want, because overall, the net benefits are going to be better. Well, the checklist that the Park Service used, where is that? And I'm over my time, so let me know. Right, it did check off either negligible or minimal, or I'm sorry, minor, I think was the terminology that's used in the checklist, for each of the challenged actions here, if I'm reading it correctly. Yeah, it was the government's position that there were minimal or minor impacts, but they based that on the master plan, which was the environmental impact statement that the state did. Is that obsolete? The master plan, no, it was new. I mean, the environmental impact statement, or whatever you call it. No, they did that environmental impact statement, and that's part of the master plan that was approved. Well, this seems to be kind of an ongoing evolution here. It has. It's been ongoing, but it's stopped. So, at the point at which they approved the master plan and the program of utilization, that's the end of the regulatory process. But there's still a lot going on. Well, yeah, they have to implement that plan over the next 15 years, so on the property, they're going to be building trails, and there's a nice map, and I think the government's brief that shows you what this property will look like, and I don't know how long, but whenever they get the funding. Any other issues, questions? Thank you. Ms. Herron. Thank you, everybody. May it please the court. My name is Rachel Herron on behalf of the federal government. With me at council table is Gabe Johnson-Karp for Intervenor State of Wisconsin. I know that the previous part of the argument jumped around a bit, but if it's agreeable to your honor, perhaps we could start in on NEPA, because that's where the discussion ended. With regard to NEPA, and specifically with regard to the question on the origin of the categorical exclusion here, the categorical exclusion does appear in a National Park Service handbook. Unfortunately, I don't have an answer for you today as to whether that handbook was subject to some public comment process, but... Isn't that error on its legitimacy? Well, that issue was not challenged by the plaintiffs here, so I don't think it's one that the court needs to consider. And I would also point out that... Your brief specifically says that these categorical exclusions have to go through notice and comment rulemaking and be published in the federal register. And then it cites to the handbook, and a portion of the handbook that appears in your appendix that doesn't correspond to the applicable categorical exclusion here. It corresponds to another one. My apologies for that, your honor. So we were kind of on a goose chase here about where this exclusion actually exists. It's nowhere in the federal register, that's for sure. We did not provide a federal register site. I can look into whether this ever did appear in the federal register and provide that information to your honors. Was it ever subjected? Did the agency ever subject it to the kind of analysis that is required under the regulations at a categorical level? The regulation says that a categorical exclusion means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no effect in procedures adopted by the federal agency in implementation of these regulations. And it cites to the notice and comment rulemaking section and for which therefore no environmental assessment or environmental impact statement is required. So were those procedures followed by the Park Service before promulgating this categorical exclusion? Unfortunately, I don't have specific information. I know that the Park Service did engage in a process in putting this together. They did coordinate with the Council on Environmental Quality which is the federal agency that's tasked with overseeing other agencies' NEPA compliance. But unfortunately, I don't have more specific information. Are you aware that that council has approved it? My understanding is yes. That information is not in the record here. We don't have, I believe, the record on the original promulgation of this categorical exclusion. Again, because the plaintiffs never took issue in this litigation with whether this categorical exclusion was a sound exclusion to be using in the first place, their only challenge was to the application of it here. Well, is the categorical exclusion that you're invoking here in fact categorical? Yes, I would say that it is. I certainly understand... It's totally circular. It is, and I would... How could it be categorical then? Well... It doesn't have an environmental impact if it doesn't have an environmental impact or significant environmental impact. There is something inherently, I think... Nonsensical about that. ...circular in the existence of the categorical exclusion as not simply this one but even in the concept of categorical exclusion because it does sort of require this upfront assessment of whether something's going to have impacts. I would say that the circumstances in which it makes sense to use a kind of categorical exclusion like this one are precisely the ones that are here in which there is some existing body of environmental analysis that the federal agency can rely on without doing its own environmental assessment or environmental impact statement to determine that in fact there are only minor impacts here. And that is precisely what happened here in that we had a situation where the state had already done an environmental analysis. The suggestion that the decision of the state to do an environmental impact analysis of its own inherently meant that the state concluded that there were significant impacts is simply incorrect. Not only did Wisconsin explain here in its brief that here it was done as sort of a salutary measure but when you look at the actual findings of the state it's very clear that they find that there are only minor not significant impacts related to these particular uses when they come to the end of their analysis. Compared to the benefits of the project as a whole? No I don't think that's. Or standing alone on their own terms? Standing on their own. So to provide the context here while the Park Service is only looking at these particular amended uses the project before the state was much broader. The state was considering the impacts of this entire master plan. So naturally in the course of this document the state is looking at impacts of other activities other than the ones that are specifically at issue here. And there are various points where the state does say that it thinks that as an overall matter the benefits of this project are going to outweigh the potential detriments. However with regard to each of the particular activities that are at use here the state documents also find that the impacts are going to be minor. When balanced against improvements. That's what the language of the state evaluation says. No I don't think that that's accurate Your Honor. There is one place with regard to wildlife impacts where the state that I think that this language that the plaintiff draws from says in which the state says while individual animals may experience stress and stress responses ellipsis any impacts to populations are expected to be minor period. Then there is a separate sentence which says when balanced against the habitat improvements that are planned ellipsis impacts ellipsis are expected to be limited. So I think that's clearly both findings. The state is saying there that the impacts to the population are going to be minor. You talk about population in animals. That's correct population of wildlife species. They come and go. Yes they do. The thing about parks and I have some personal reflection on that where I'm from a lot of people a lot of different people have different ideas about what they do. They want to be able to cross country ski. They want to do other things. Horses on a cross country ski course don't work very well. And nor do hiking. You know the signs I see at home is that no hiking on the ski trail. So hikers don't like that. Although they do separate that. So I'm very interested in this because I really like parks and I like the idea of them. I see this huge area and that's when I get confused and then it's your turn about this. When you talk about something is disturbed, highly disturbed, I guess that means something's in the way or when you tear down a building there's a lot of junk laying around or what? Well I think disturbed sort of I agree that kind of at the end of this process the goal will be that this land no longer appears on the surface to be highly disturbed. It's going to look more like a park land. That's explicitly the state's goal. Disturbed refers to the fact the origin of this property which was that it was an ammunition plant. There are still across this property various places where there are landfills for example. But with regard to your question about the competing uses and the concern about whether some kinds of uses exclude other kinds of uses, those are all very valid questions. Unfortunately they're just simply not questions that are for the Park Service to determine here. This property belongs to the state now and these sort of fine grained distinctions about what kind of uses within the broad umbrella of parks and recreation, those are all questions for the state now. Under the Property Act the question for the Park Service was simply whether these uses were consistent with the uses for which the property was conveyed. And the deeds are explicit in the first page of each of the deeds in the record that they are conveyed quote for and in consideration of the use and maintenance of the property here and conveyed exclusively for park or public recreation uses in perpetuity. That is the federal government's interest under the Property Act. It's simply making sure that we are within this broad ambit of parks and recreation. Once we're talking about these fine gradations of what kind of uses are appropriate within that umbrella, that's a question for the state. Now here there is the fact that the deeds themselves did contain an additional condition which said that the uses would also need to be consistent with the original program of utilization which was the application that Wisconsin had submitted. But it also explicitly says that that program of utilization can be amended. And in fact the program of utilization itself also stated that it was, first of all it was a four page document. It was explicitly tentative. It didn't rule out any uses but it did include some sample uses. And it said that the final decision on what uses were going to be allowed on the property would come after the state went through its public master planning process which is exactly what had happened here. So there's. I think this is a good time for you to talk about helicopters. Yes, absolutely. So the helicopters, the federal government doesn't dispute. They're not a recreational activity. But that is, there's another section of the statute, section 550E sub B which says that the government quote may contain, excuse me, that the deed may contain additional terms, reservations, restrictions, and conditions the Secretary of the Interior deems are necessary to safeguard the interests of the government. And I gather the question is just how much thought did the Secretary give to this matter? That seemed to be your colleague's basic point here. Yes, so three points on that, Your Honor. The first is that as the government stated in its brief, the alliance never raised that argument below. So we believe it's forfeit. But even accepting if it's not forfeit, I think that Wisconsin is over reading the requirement here. What the statute says is that the term in question needs to be necessary to safeguard the interests of the government. Here there's no question that the Army has an interest in continuing these helicopter training activities. In fact, as the record shows, the Army said that it was going to require that they be allowed to continue as a condition of this deed. Now the alliance seems to argue that what needs to happen is actually a sort of more searching analysis of whether this is not just an interest that the Army has, but whether it's sort of the only way to achieve this interest, whether it's kind of overall in the best national defense interest of the country. But that's simply not what the statute requires. You're not really relying simply on the deed, are you? You're relying here on the fact that the statute itself does make an exception to the recreation use. Yes, that's absolutely right. Okay, by permitting the secretary to allow another use if it's with the, what is the word, interest of the government? Yes, the interests of the government. And it just seems like he, it's just not terribly convincing how much focus any government official put on the fact that these choppers were going to come in at very low altitudes, fairly frequently. Yes, but I think that the question of whether, of what the impact would be on this property is a separate one from the question of whether the Army has an interest in the Wisconsin National Guard being able to continue. But it's the Secretary of Interior who has to make the determination, right? Yes, but the determination. He's got to decide if it's in the interest of the United States that these choppers come in. Yes, if it's in the interest of the government. And there's no, the record doesn't contain any kind of correspondence or inquiry by the Secretary of Interior to the Secretary of Defense as to whether he needs this for the proper training of the Wisconsin National Guard? Well, there is. This department is the Secretary of Defense and has the statutory responsibility for the training and equipment of the Wisconsin National Guard. So there is in the record, in the federal government's appendix, correspondence between, it's not from the Secretary of Defense, but that memorializes the fact that the Army did say that they were going to require that these activities go on as a condition of them transferring this land to Interior to be transferred to the state. Because remember, this land- So there is some indication that Interior and Defense talked. Yes, absolutely, they did. And I think the idea that Interior would then at that point need to come in and sort of second guess the Army as to the appropriateness of continuing these training activities, which are the Army's to decide, it doesn't seem to be, to us, a sensible way to read the statute. I had mentioned there was a third point on this issue as well. And that's simply that even if we kind of take a step back and just say, what is in the record to show that this is a beneficial use, not shortchanging the fact that certainly helicopters have an effect on parkland. This activity has been going on for decades. There's specific information in the record with regard to the particular tasks that are gonna be trained here. Well, your brother's counterpoint to that is, yeah, well, when we were making ammunition there, nobody cared about the choppers coming in. But now the national purpose is to have a nice park and the choppers are still coming in. There's a disconnect there, unless we can show that there was an appropriate decision made under the Parks Act, right? Yes, and I think that we do show that here. And the Interior Department consulting with the Army and getting that direction from the Army that this activity should go on. I would also- Well, there was no environmental assessment of any kind on the helicopter training. I think we've moved from the Property Act claim to the NEPA claim. Certainly, the state does, in its master plan, contains some, does do some analysis of what the impacts from helicopters would be. But Interior did not, the Park Service, excuse me, did not make a finding with regard to the impacts of the helicopters because it was not, under NEPA there's no requirement to study an activity that the agency has no discretion over. And here, Interior did not have discretion over allowing this activity to continue. Because the statute simply says the Secretary can permit the activity, am I right? Well, because the reason is that this property that the Secretary is transferring is coming to the Secretary from the Army. So to the extent the Army says there are certain conditions that are attaching to this land, then the Secretary can't convey what the Army hasn't given it in the first place. But this is where I think you're tripping yourself up a little bit in your brief. It's not clear, though, as to, yes, to the degree to which you're relying on the deed and to the degree to which you're relying on the separate interpretation of the Secretary of the Interior in conjunction with the Secretary of Defense that this exception to the recreational use is indeed required. There seems to be two arguments being made by the government here that are in tension. Frankly, it caused us a great deal of trouble in reviewing the briefs. Well, I apologize for that. Oh, you don't have to apologize. It's just something we got square away. Well, let me see if I can try to resolve that tension. Yeah, that's a tension. And I agree that there is, I can see what you mean by the some tension there. And my sister's point may be well taken. It may be that, are we mixing acts up here and reauthority under the two acts? So I think that with regard to the Property Act, to try to keep this as clear as possible. I think that would be a good way of approaching it. Yes. There is statutory authority to include these conditions when they are, I'm making sure I'm using the exact right language, necessary to safeguard the interests of the government. That's right, under the Property Act. That's right. And here we have that in the record because we know that ARME said include this as a condition. Secretary of Interior, excuse me, was justified at that point in saying, ARME needs this, it's in the national interest, we therefore put it in the deed. Next, if we go to NEPA, the question in NEPA is what kind of authority the Secretary had, whether the Secretary had discretion to allow helicopter use or not allow helicopter use. Here, because ARME had directed and said, we directed this be put in the deeds as a condition of their use going forward, there was no discretion on behalf of the Secretary of the Interior to not include that. And that is why no NEPA analysis needs to be done. And where does that principle appear in the statute or regulations? That is, you know, it doesn't appear in the statute, but I think the Supreme Court's decision in public citizen has well established this idea that agencies simply don't have to do NEPA analysis when they don't have discretion to not do and not create the impacts that would be studied. So there's no independent NEPA obligation on the part of the Secretary to do an environmental analysis, given the exception in the Property Act. Is that basically what you're saying? That's correct, yes. Okay, you have to read the two statutes in paria materia. Right, right. The question of whether the Secretary had discretion for the purposes of a NEPA question depends on what happened at the Property Act. That's the problem we had with the government's position trying to prepare for our argument today. I see. I see. Has that been helped to clarify that question now? I think you've given us a good explanation of the government's position. Right, as I understood the district court's decision and the rest of the government's argument, it was that, well, this has been going on forever, so there can't be any environmental impact. That can't possibly be right. That's the troubling point, yeah. I see, and I think there is language in the government's brief that says that the Secretary was bound to do this. I acknowledge that it may not be fully briefed out, may not have the public citizen citation, but that, not just the fact that this helicopter activity has gone on for so long, but because it's been directed by the Army as a condition of the deed for purposes of the Property Act analysis. And reading the two statutes together, there's no authority in the Secretary of the Interior to do an independent environmental analysis of that determination under the Property Act that the helicopters should continue. There's no need to, that's right. No need to or no authority? Well, I mean, Interior could always just do more environmental analysis just for the public benefit, but there's no need under NEPA, no requirement. No requirement. To do the environmental analysis if it doesn't have a choice. Thank you. I thought the original master plan called for phasing out helicopter training and the original program of utilization. Wasn't that contemplated, that this helicopter training would be phased out? So there's only, as a point of clarification, there's only one master plan. Master plan being? Oh, right. There was one draft submitted and then it was withdrawn and resubmitted with these additional uses that are in contention here. So the draft master plan that the state submitted and which the National Park Service commented on did contain these uses. The documents that didn't contain these uses that are at issue here are much earlier in the process. And they are, for example, the report that was put together by the Badger Reuse Committee. Which was not, it's not an official government plan. It was a local organization creating a goal document. And that goal document did inform the state's program of utilization that it submitted. And it's true that the program of utilization, I don't believe spoke to helicopters at all in specific. It was four pages and not particularly fine-grained. But certainly the thrust of that program of utilization was that this was going to be more of a sort of tranquil, primitive recreation environment. But again, said that the uses would be determined only after, specific uses would be determined only after the state's public master planning process went through. But the master plan specifically says that it is likely that helicopter training will be required to be phased out. Yes, that's true. And I apologize, I misunderstood, Your Honor. In part, because if you look at the explanations of the master plan, the National Park Service had said, we cannot allow this as a recreation use. So whether the helicopter use could go forward would depend on the Army having made that determination about the helicopter use going forward. At the time of the draft master plan, the Army had not yet made that determination. So the state's understanding, like the National Park Service's understanding, was that unless the Army did give that direction to Interior, the helicopter use wouldn't be justified because it couldn't be shoehorned into a recreational use of the property. So this is just an Army condition on the deed. Yes, that's correct. That must be allowed as a matter of law, regardless of environmental impact. Yes, and there are many, helicopter use is obviously the most sort of intensive and disruptive, but there are many Army conditions in these deeds that are in the record, including conditions requiring that the Army be able to harvest clay from certain parcels that they use as fill elsewhere, that the Army be able to have access to a cemetery that still exists on one of these parcels. The helicopter use obviously has gotten attention here because it has environmental impacts, but in terms of the idea that the Army is allowed to put conditions on this property that used to be it before it gets transferred to the public, that's allowed by the statute and is unexceptional. If your honors have no further questions, I see I'm well over my time. Thank you. Mr. Potts, I think your time had expired, but you can have three minutes to rebut. We've got a lot to talk about. Yeah, thank you. So first off, I want to refute the position that we didn't raise below the issue of helicopters and the deed. The confusion arises, frankly, because the district court's opinion seemed to think that we waived arguments because we didn't raise them in a reply brief. But our initial brief raised every single one of the issues, and I pulled it this morning, and it's page 14 and 15. So I think it's not accurate to say that they were not raised below at the district court level. So that's the first thing I want to clarify. The second is about this determination by the secretary with regards to helicopter training. We don't dispute that the statute allows the secretary to make a finding, and since we've been talking about it a lot, I pulled out the language that says necessary to safeguard the interests of the government. That's more than just in the interest of the government. That's to safeguard the interests of the government. So the issue here is not that they can't do it, it's that they didn't do it. There is no document that they can point to that was a finding that they need to do this that lays out the reasoning at all. So we're all up here guessing, and the government is saying, oh, well, we have some communications behind the scenes. How is the alliance supposed to vet, have any comment, challenge any of that if they're just going to sort of willy-nilly make these decisions? And then also, it's an action they're taking that they didn't do any environmental analysis for, which if they're saying they took this separate action to exclude from this property and allow the army to go use helicopters, that's another action that's probably subject to NEPA, which we've kind of gotten offline here, but because the government doesn't have a document that they can point to to say, here are the reasons why we need to do helicopter training to safeguard the interests of the government, we're all sort of speculating. Well, the government just represented to us that there was correspondence from the Department of Defense on the matter. There may have been internal emails, but there's no letter they can point to, there's no finding by the secretary that's been cited anywhere in the record. Sounds like the two of you ought to get together and tell us what's in the record at this point. Yeah, it's a bit of a laughing matter. We've put a lot of time into this thing. Yeah, I mean, we'd be happy to follow up, but I would say it's the government's burden to provide a citation of what that correspondence is, and we wouldn't oppose if they want to send you a letter and cite that. On the NEPA claim with regard to the other two uses that you're contesting, the motorcycle off-roading and dog trialing, the government says the better reading of the master plan environmental assessment that was done by the state is that it contains both the NEP findings and the standalone findings on those two activities. Is that fair? No, that's not fair. I mean, that's what the government says, but that's not a fair reading of the master plan. And I had to quote, you actually went exactly to where I was going to go, which is this is the language of the master plan, and it's in a conclusionary section. In light of the substantial and long-term increases in population of native species at the area, including many rare species that are anticipated from habitat restoration and management, the uses of the property are expected to have relatively minor adverse impacts on overall improvement to populations. That is exactly doing a net benefit analysis. Right, that's in the conclusion section, but in the sections that are devoted to these two uses specifically, more specifically, there's more discerning findings about the impacts being minor, and those findings appear to be standalone findings rather than comparative findings. Yeah. I'm not, I mean, it's a big document, and they said a lot in it. I think the overall reading is clearly that they're essentially saying this isn't a problem because we're going to make the property so much better, which you're not allowed to do under NEPA, but, and I go back to the point, I wanted to clarify one other thing that's related to this, which is the government cites in its brief the Highway J case for the proposition that a state environmental impact statement can be relied on for a categorical exclusion by the federal government, but actually, in the Highway J case, that was not an environmental impact statement. I went back and looked, and I had to pull the district court decision. That's called a totally different environmental review that was done there, so that case is A, not on point, and B, doesn't answer the question of whether if a state does an environmental impact statement, the government, using a categorical exclusion, can say there's no impact. That case was also about the extraordinary circumstances exception. Yeah, right. It didn't have anything to do about the application of the categorical exclusion in the first place, so it's just not. Yeah, it's not applicable. I think those were the main things I wanted to follow up on. Did you guys have any other, do you all have any other questions? Thank you. Thank you. Thanks. Can you provide the citation to that one? Yes. Sure. Better now than in a letter. Because I understand there's been confusion about this. The document that the government's pointing to is the Federal Appendix 96. It is an email between the Park Service and GSA. It's not, the Department of Defense is not copied on the email chain, but there's a statement, and I'm quoting here, from the GSA saying, I am sending this to confirm that the assignment package for parcel V1 is officially amended based on a requirement imposed by Army to allow continued use of the parcel by the Wisconsin National Air Guard for helicopter training activities. And this is from GSA? Yes. As you recall, GSA is the middle step between Army, whose surplus property it is, and the Park Service, who is ultimately dispersing it. I wanted to clarify that. So GSA is telling us what the Secretary of Defense thinks about the national interest and helicopter training? Well, it's conveying what the Army told it. I regret that I don't have a citation for you or something that I can point to in the appendices. Do we have anything from somebody a little bit more national about national defense than GSA? What we have is the GSA's explaining what the Army conveyed to the GSA. And while you're providing appendix citations, you have one for the specific categorical exclusion that you're invoking here? I do, yes, Your Honor. Allow me to just pull it up very quickly. Federal Appendix 63, that is where it appears within the National Park Handbook. That's what you cited, but that's not where it appears. And that's what's included in your appendix. That's page 33 of the handbook, and that's Categorical Exclusion 3.3A. I see, so- You invoked 3.3B, and we don't have that in the record, so far as I could tell. So in my Federal Appendix 63, it's not enumerated here as number one. I'm not sure, I apologize for the difference between the- Well, if you just look right above that, it's 3.3A1. Page 33 of the appendix? Yes. If you're looking at your brief, that's a cite to page 33 of the handbook. I see, well, I think the language that appears on Appendix 63, perhaps there's a typo with regard to whether it's supposed to be A1 or B1, contains the language of the categorical exclusion, which is changes or amendments to an approved action when such changes would cause no or only minimal environmental impact. I think perhaps there's a- B? I think- Sorry to split hairs here, but we do need the right one. No, I understand. I suspect that perhaps the reference to B may be the error, but I can check and pull the rest of that from the record and provide that citation. Well, B is the one that's cited in your agency's checklist, where you said this qualifies. So I think that's the one that was invoked here, and we're bound by that. But 3.3A1 pertains to actions relating to general administration, which this is not. I think it's a project and a deed conveyance, so it must fall under something else in your handbook, which, again, we don't know if it was subjected to notice and comment rulemaking. I can certainly get the citation to 3.3B and the page number to your honors in our letter, if we prefer. That would be helpful, and maybe it's somewhere else in the record. We just couldn't find it. And I apologize, I can't provide it for you this morning. Thank you, your honors. All right, our thanks to all counsel. The case is taken under advisement.